## STATE OF CONNECTICUT *v.* JAIRO AMARILLO
### (11903)

PETERS, C. J., HEALEY, SHEA, DANNEHY and SANTANIELLO, Js.

Argued November 5, 1985—decision released January 14, 1986

*Stephen F. Donahue,* with whom, on the brief, was *Elaine M. Skoronski,* for the appellant (defendant).

*David S. Shepack,* deputy assistant state's attorney, with whom, on the brief, were *Eugene J. Callahan,* state's attorney, *Judith Rossi,* special assistant state's attorney, and *Bruce Hudock* and *John M. Massameno,* assistant state's attorneys, for the appellee (state).

SHEA, J. The defendant, Jairo Amarillo, was convicted, after a trial to a jury, of sexual assault in the first degree in violation of General Statutes § 53a-70 (a),[1] kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A),[2] and robbery in the third degree in violation of General Statutes § 53a-136.[3] From this judgment the defendant appeals, asserting numerous claims of error relating to: (1) the sufficiency of the evidence; (2) the victim's identification of him;

[1] "[General Statutes] Sec. 53a-70. SEXUAL ASSAULT IN THE FIRST DEGREE: CLASS B FELONY: ONE YEAR NOT SUSPENDABLE. (a) A person is guilty of sexual assault in the first degree when such person compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person."

[2] "[General Statutes] Sec. 53a-92. KIDNAPPING IN THE FIRST DEGREE. (a) A person is guilty of kidnapping in the first degree when he abducts another person and when: (1) His intent is to compel a third person to pay or deliver money or property as ransom, or to engage in other particular conduct or to refrain from engaging in particular conduct; or (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually; or (B) accomplish or advance the commission of a felony; or (C) terrorize him or a third person; or (D) interfere with the performance of a government function."

[3] The defendant was charged with robbery in the first degree; General Statutes § 53a-134 (a) (3); but was convicted of the lesser included offense of robbery in the third degree.

(3) the allegedly improper police identification techniques; (4) the trial court's charge to the jury; (5) the trial court's denial of his motion to dismiss; and (6) the trial court's refusal to accept the defendant's plea under the *Alford* doctrine. *North Carolina* v. *Alford,* 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970). We find no error.

I

The defendant claims that his motion for judgment of acquittal should have been granted because there was insufficient evidence to prove that he was the perpetrator of the crimes charged. We find no error in the trial court's denial of this motion.

From the evidence adduced at trial the jury could have reasonably found the following facts: On January 31, 1982, the victim stopped for ice cream at a store in Port Chester, New York. As she was sitting in her car eating ice cream, the defendant brandished a knife and forced his way into the car. He pushed the victim over to the passenger seat and locked the car door. Leroy Frost, a patron in the ice cream store, witnessed the entire incident, yet did not attempt to intercede. The defendant then drove to a restaurant in Greenwich, Connecticut, parked behind it and kissed the victim against her will. In fear for her life, the victim asked the defendant if he wanted any money. Still holding the knife, he responded, "Sure, give it to me." She gave him about three dollars. The defendant then drove to Putnam Green Apartments in Greenwich. In the parking lot, the defendant again threatened the victim with the knife and demanded that she take off her coat and shirt. He then touched her breasts and forced her to perform fellatio on him. After the incident, the defendant drove back to Port Chester and exited the car on a main street near two local taverns, pleading with the victim not to report the incident to the police.

In reviewing a sufficiency of the evidence claim, " 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Johnson* v. *Louisiana,* 406 U.S. [356, 362, 92 S. Ct. 1620, 32 L. Ed. 2d 152 (1972)].' " (Emphasis in original.) *State* v. *Scielzo,* 190 Conn. 191, 197, 460 A.2d 951 (1983), quoting *Jackson* v. *Virginia,* 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560, reh. denied, 444 U.S. 890, 100 S. Ct. 195, 62 L. Ed. 2d 126 (1979); see *State* v. *Morrill,* 197 Conn. 507, 512, 498 A.2d 76 (1985); *State* v. *Rutan,* 194 Conn. 438, 444, 479 A.2d 1209 (1984).

With respect to the sufficiency of the evidence, the defendant argues that the identifications by the victim and by the witness, Frost, were inadequate to counteract his alibi, especially in the absence of corroborative physical evidence. The defendant misperceives our function in reviewing claims questioning the sufficiency of the evidence. This court does not retry the case or evaluate the credibility of the witnesses. The resolution of conflicting testimony is the province of the jury. *State* v. *Martin,* 189 Conn. 1, 9, 454 A.2d 256 (1983). The victim testified that she was absolutely certain that the defendant was her assailant. Frost, the eyewitness to the initial abduction, made an in-court identification of the defendant. Any prior misidentifications or conflicting descriptions of the defendant were reasonably resolved by the jury against the defendant. The evidence was sufficient to support the jury's conclusion that the defendant was the victim's assailant.

The defendant also argues that the evidence was insufficient to establish that he had engaged in "sexual intercourse" with the victim. Under General Statutes § 53a-65 (2), penetration, however slight, is required to commit sexual intercourse by fellatio. See

*State* v. *Kish,* 186 Conn. 757, 765, 443 A.2d 1274 (1982). The victim testified at trial that he "forced my mouth onto his penis and had me perform fellatio about three times." The victim's mother also testified that shortly after the assault her daughter told her that "he put his penis in [my] mouth." The evidence, viewed in a light most favorable to sustaining the verdict, could reasonably have allowed the jury to find that penetration had occurred.

## II

The defendant also claims that the trial court erred in denying his motion to suppress the victim's identification of him. He challenges the show-up identification procedures used by the police and claims that the suggestive procedures tainted the in-court identification.[4] We examine this claim in the context of these additional facts: When the victim returned home after the attack, she was crying and told her mother of the incident. Later that night, after her mother had notified the police, the victim returned to Port Chester with a member of the Greenwich police department. The victim initially described her assailant as a light-skinned black man, with a mustache, wearing a hat, a blue jean jacket, a white sweater and blue jeans. Upon her arrival, a sergeant with the Port Chester police department suggested that she accompany him to two local taverns, Romando's and the Canary Bar, both in close proximity to the location where the assailant had left her car. The victim had told the officer that her assailant was

---

[4] The defendant did not object to the testimony of the victim concerning the two out-of-court identifications. He objected only to the victim's in-court identification. An examination of the trial transcript, however, does not indicate what transpired after the defendant objected. It does not provide the basis on which the trial court denied the motion to suppress nor does it establish that the defendant properly excepted to the court's denial of the motion. Nevertheless, because his claim raises an issue of constitutional dimension, we will evaluate it as an "exceptional circumstance." *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973).

walking toward the taverns when he left her car. The officer entered the Canary Bar and discovered the defendant, who closely matched the description of the assailant. The victim then entered the Canary Bar and identified the defendant, the sole patron in it, as her attacker. The defendant was then arrested. Later, at the Port Chester police station, the victim again identified the defendant as her attacker after viewing him alone in a room with a uniformed police officer. She recognized him immediately and was certain that "he was the same guy . . . he was wearing the same clothes—I will never forget his face." Finally, in court, in addition to testifying as to the two previous identifications, the victim positively identified the defendant as her assailant.

In order to determine whether identification procedures violate the defendant's due process rights, it must be determined (1) whether the identification procedure was impermissibly and unnecessarily suggestive, and (2) if so, whether the identification was nevertheless reliable based upon an examination of the totality of the circumstances. *State* v. *Perez,* 198 Conn. 68, 73, 502 A.2d 368 (1985); *State* v. *Hinton,* 196 Conn. 289, 292–93, 493 A.2d 836 (1985); *State* v. *Austin,* 195 Conn. 496, 499, 488 A.2d 1250 (1985); *State* v. *Hamele,* 188 Conn. 372, 376, 449 A.2d 1020 (1982); *State* v. *Theriault,* 182 Conn. 366, 371–72, 438 A.2d 432 (1980); see also *Manson* v. *Brathwaite,* 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); *Neil* v. *Biggers,* 409 U.S. 188, 199–201, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972).

The defendant argues that the first identification at the Canary Bar was impermissibly suggestive because he was the only patron in the bar at the time and because the police prompted the victim to enter the bar. He claims that this amounted to a one-on-one "show-up" identification that violated his due process rights. See *Simmons* v. *United States,* 390 U.S. 377, 384, 88

S. Ct. 967, 19 L. Ed. 2d 1247 (1968). Although such an identification procedure may be inherently and significantly suggestive because it often conveys the message that the police have reason to believe the suspect guilty; *State* v. *Dupree,* 196 Conn. 655, 667, 495 A.2d 691, cert. denied, 474 U.S.  , 106 S. Ct. 318, 88 L. Ed. 2d 301 (1985); *State* v. *Guertin,* 190 Conn. 440, 456, 461 A.2d 963 (1983); *State* v. *Middleton,* 170 Conn. 601, 608, 368 A.2d 66 (1976); it was not *impermissibly* suggestive in this case.

Unlike other cases where an individual already in police custody is clearly presented to the victim as a possible suspect, the defendant in this case was identified in a public place and was not then in police custody. The police officer had found in the bar he entered, in close proximity to where the victim had last seen her assailant, an individual who closely matched the description he had received. Although the police may have suspected that the defendant was the perpetrator, it is doubtful that they could, constitutionally, have detained him in order to prepare a lineup identification for the victim. Therefore, although the victim believed that she was entering the bar to view a possible suspect, she was not presented with the defendant in a manner suggesting that the police believed him to be her assailant. The defendant was viewed having a beer in a public place. The police officer escorted the victim into the bar, but he did not direct any attention to the defendant nor ask the victim any questions concerning the defendant. As the victim must have realized, the only reason she was requested to enter the bar was its proximity to the place where she had left the assailant and her own description of him. Although the defendant was the only patron in the bar, the police had not contrived this circumstance. It was necessary for the police to have a prompt identification made because, without it, they could not have held the suspect. At this stage of the investigation it was vital to

eliminate quickly any innocent parties so as to continue the investigation with a minimum of delay. *Simmons* v. *United States,* supra; *State* v. *Maturo,* 188 Conn. 591, 596, 452 A.2d 642 (1982); *State* v. *Hamele,* supra, 377; *State* v. *Middleton,* supra; *State* v. *Mallette,* 159 Conn. 143, 149, 267 A.2d 438 (1970). Although the identification procedure did involve some elements of suggestiveness, the exigencies of the situation justified the procedure and it was, therefore, not unnecessarily suggestive.

Even were we to assume that the identification procedure was unnecessarily suggestive, the victim's identification at the Canary Bar was clearly reliable in light of the totality of the circumstances. "[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the [victim] to view the criminal at the time of the crime, the [victim's] degree of attention, the accuracy of the [victim's] prior description of the criminal, the level of certainty demonstrated by the [victim] at the confrontation, and the length of time between the crime and the confrontation." *Neil* v. *Biggers,* supra, 199–200; see *State* v. *Aversa,* 197 Conn. 685, 694, 501 A.2d 370 (1985); *State* v. *Hinton,* supra, 293. The victim had her assailant under close observation for over one hour. Although the incident occurred at night, the interior light of her car was on when the assailant initially entered the car and, on later occasions during the abduction, the passenger compartment of the vehicle was illuminated by street lamps and headlights from other automobiles. Her description to the police accurately described her assailant's physical appearance, his facial features and the clothes he was wearing. The only discrepancy in her description was that the defendant is not a "light-skinned black man" as she had thought. She testified at trial, however, that she merely had assumed from his skin coloration that he was black. Certainly the trial

court could have found that this misstatement did not detract substantially from the reliablity of the identification. The victim was not in any way equivocal with respect to her identification of the defendant. Finally, the identification occurred within one hour of the incident and in close proximity to the location where the assailant had left the victim's car. The victim was "no casual observer, but rather the victim of one of the most personally humiliating of all crimes." *Neil* v. *Biggers,* supra, 200. " 'Virtually no other crime offers the opportunity for observation of the perpetrator as the crime of rape.' " *Grant* v. *State,* 446 S.W.2d 620, 622 (Mo. 1969). Under the totality of the circumstances, the identification was sufficiently reliable to warrant its admission into evidence.

The defendant also claims that the procedure used to obtain the victim's second identification of him at the police station, where he was alone except for the presence of a uniformed officer, was impermissibly suggestive. Because the defendant was under arrest and in custody, the concern of necessity for an immediate identification was no longer present. There was no justification for a show-up identification at this point because a lineup could easily have been arranged. Nevertheless, because the first identification was constitutionally permissible, the identification at the police station could in no way have prejudiced the defendant by tainting his in-court identification by the victim. *State* v. *Perez,* supra. Although the in-court identification of the defendant could withstand a due process reliability analysis, in the absence of a tainted pretrial identification we need not consider whether there was an independent basis for it. *Neil* v. *Biggers,* supra; *State* v. *Guertin,* supra, 459. There is no error in the trial court's denial of the defendant's motion to suppress.

## III

The defendant next claims that the trial court erred in denying his motion to dismiss which was based upon the improper practice of the Greenwich police department in neglecting to preserve fully the evidence relating to an identification by a witness.[5] This claim arose out of the identification of the defendant made by Leroy Frost, an eyewitness to the initial abduction of the victim, who was shown a photographic array of eight pictures, including one of the defendant. Frost recognized one or two of the photographs as resembling the man who attacked the victim in front of the ice cream store. A police detective testified that Frost did not specifically identify any photograph, but merely pointed out one or more that were "close" to the description of the attacker. Frost did not identify the photograph of the defendant as "close," but he did identify the defendant in court.[6] The police detective also testified that,

---

[5] The state maintains that this claim is not reviewable because a motion to dismiss was not proper under the circumstances of this case. A motion to dismiss, predicated on a violation of *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), is the proper sanction only when there is alleged prosecutorial misconduct in the suppression of the exculpatory evidence. Practice Book § 747; *State* v. *Festo,* 181 Conn. 254, 265, 435 A.2d 38 (1980). Because there is no such claim in this case, the proper remedy would have been to strike the witness' testimony. *State* v. *Perez,* 181 Conn. 299, 310, 435 A.2d 334 (1980). Because the trial court would have been free, however, to strike the witness' testimony even though the defendant specifically moved for a dismissal, we evaluate the defendant's claim on that basis. The possibility that the defendant would not have desired that the testimony be stricken, because evidence of his earlier misidentification clearly would be favorable to the defendant, is a tactical consideration which does not alter our analysis. Further, although the denial of a motion to dismiss is ordinarily not assignable as error; *State* v. *Peay,* 165 Conn. 374, 375, 335 A.2d 296 (1973); the defendant's claim will be discussed because it implicates a fundamental constitutional right. *United States* v. *Agurs,* 427 U.S. 97, 112, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976); see *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973).

[6] The defendant does not claim that this in-court identification was impermissibly suggestive. The defendant did, however, make a motion before

because no *positive* identification was made by the witness, in accordance with department procedure the array was dismantled and the tentatively identified photographs were put back into police files. No record was made by the police of any of the photographs that Frost had indicated as resembling the man who had abducted the victim. The defendant claims that he was denied due process of law because the photographic array and the particular photographs selected from the array were clearly exculpatory in nature and should have been provided to him pursuant to his general request for exculpatory evidence.[7]

In *Brady* v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." See *State* v. *Cohane*, 193 Conn. 474, 495, 479 A.2d 763, cert. denied, 469 U.S. 990, 105 S. Ct. 397, 83 L. Ed. 2d 331 (1984); *State* v. *Altrui*, 188 Conn. 161, 177, 448 A.2d 837 (1982). "The heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence." *Moore* v. *Illinois*, 408 U.S. 786, 794-95, 92 S. Ct. 2562, 33 L. Ed. 2d 706, reh. denied, 409 U.S. 897, 93 S. Ct. 87, 34 L. Ed. 2d 155 (1972).

trial to conduct a lineup to test Frost's ability to make an identification. The motion was denied by the court.

[7] General Statutes § 54-86c (a) requires the state to disclose, "[n]ot later than thirty days" after a defendant pleads not guilty, "any exculpatory information or material . . . whether or not a request has been made . . . ." See Practice Book § 741 (1).

In *United States* v. *Agurs,* 427 U.S. 97, 108, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976), the court further amplified the materiality component, holding that a prosecutor does not violate a constitutional duty of disclosure "unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." "If the omitted evidence creates a reasonable doubt [of guilt] that did not otherwise exist, constitutional error [is] committed. . . . The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." Id., 109–10; see *State* v. *Doolittle,* 189 Conn. 183, 197, 455 A.2d 843 (1983).

Our analysis will proceed based on the assumption that the failure of the police to preserve the photographic array and any of the tentatively identified photographs was a "suppression."[8] Therefore, the defendant must prove, in order to establish a *Brady* violation, that the suppressed evidence was not only favorable to him but also material to his guilt. Favorable evidence is that "evidence which . . . might have led the jury to entertain a reasonable doubt about . . . guilt." *Levin* v. *Katzenbach,* 363 F.2d 287, 291 (D.C. Cir. 1966); see *State* v. *Green,* 194 Conn. 258, 265, 480 A.2d 526 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 964, 83 L. Ed. 2d 969 (1985). Certainly, in light of the questioned identification and alibi defense in this case, the evidence would have been favorable to the defendant, because it does undermine Frost's testimony as well as suggest the possibility of another suspect in the crime. Our focus, therefore, is on the materiality of the

---

[8] There was no claim that the state deliberately or in bad faith suppressed the photographic array involved. An intentional or deliberate suppression of material evidence would constitute a per se violation of due process sufficient to reverse a criminal conviction. See *United States* v. *Keogh,* 391 F.2d 138 (2d Cir. 1968).

suppression. "Evidence is material if it 'could . . . in any reasonable likelihood have affected the judgment of the jury.' *Napue* v. *Illinois,* 360 U.S. 264, 271, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959)." *State* v. *Green,* supra.

Because the defendant did not make a specific pretrial request for the photographs, the appropriate level of materiality that need be proven here to establish a *Brady* violation is that the omitted evidence creates a " 'reasonable doubt [as to guilt] that did not otherwise exist . . . [and] the omission must be evaluated in the context of the entire record.' *United States* v. *Agurs,* supra, 112; *State* v. *Packard,* 184 Conn. 258, 279, 439 A.2d 983 (1981)." *State* v. *Green,* supra.

Clearly, the missing photographic array would have had some materiality to the extent that it might have operated to impeach the credibility of Frost. Where such evidence would have contradicted the testimony of a key state's witness, or cast such serious doubt upon his credibility as to leave the jury with a reasonable doubt of the defendant's guilt, its suppression can vitiate a criminal conviction. *Levin* v. *Katzenbach,* supra. The vital question, however, is an examination of the overall value of the "suppressed" evidence to the defendant in light of the other evidence admitted against him. *United States* v. *Agurs,* supra. We conclude that the photographic array and selected photos were not of such importance as to have been likely to have changed the result of the trial by creating a reasonable doubt as to the defendant's guilt. This is not to say that the array of photographs should not have been preserved. "Admittedly, it might have been a better procedure if the Police Department had kept a record of all such pictorial arrays." *United States* v. *Clemons,* 445 F.2d 711, 714 (D.C. Cir. 1971). We cannot say, however, in this case that the omitted evidence would have cast any additional doubt on the defend-

ant's guilt. Whether this rationale is stated in terms of nonmateriality, lack of prejudice, or harmless error is not particularly significant; the result is the same.

The defendant had ample opportunity, in the presence of the jury, to cross-examine Frost regarding the identity of the alleged assailant. In fact, the defendant elicited from Frost all of the circumstances of the unsuccessful identification procedure and also the vitally important fact that Frost did not in the photographic array procedure identify the defendant as the victim's assailant. Further, the police detective who conducted the array testified to Frost's inability to recognize the defendant. The jury was also well aware that the array was not preserved. On the basis of this highly effective cross-examination and impeachment testimony, the jury was free to draw inferences unfavorable to the state. Nevertheless, the victim identified the defendant and, as earlier discussed in part II of this opinion, exhibited a high degree of certainty. Frost did not positively identify any of the photographs as depicting the victim's assailant; he merely picked one or two that resembled the attacker. He did, however, positively identify the defendant in court. Against this evidence, we cannot conclude that the selected photographs and the entire array, if available, would have so further discredited Frost's testimony and in-court identification as to have induced a reasonable doubt of the defendant's guilt.

## IV

The defendant also claims various errors relating to the trial court's charge: (A) that the instructions violated the rule of *Sandstrom* v. *Montana,* 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979);[9] (B) that the

---

[9] The state argues that because the defendant did not except to the court's additional instruction on intent, he has waived his appellate claim. See *State* v. *Jones,* 193 Conn. 70, 87–89, 475 A.2d 1087 (1984). The defendant's *Sand-*

instructions did not, as he had requested, advise the jury that, if it found that the abduction was incidental to the crime of sexual assault, then it must find him not guilty of kidnapping; see *State* v. *Dubina,* 164 Conn. 95, 99–100, 318 A.2d 95 (1972); and (C) that the instructions did not, as he had requested, instruct the jury as to the rule of *Secondino* v. *New Haven Gas Co.,* 147 Conn. 672, 675, 165 A.2d 598 (1960). We find error in none of these claims.

## A

The due process clause of the fourteenth amendment to the United States constitution "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship,* 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). In *Sandstrom* v. *Montana,* supra, 517–24, the United States Supreme Court held that a jury instruction that "the law presumes that a person intends the ordinary consequences of his voluntary acts" violated the defendant's due process rights because a reasonable jury could have interpreted the instruction as a conclusive or burden-shifting presumption and thus relieved the state of its burden of proving every element of the crime. See *Francis* v. *Franklin,* 471 U.S. 307, 105 S. Ct. 1965, 85 L. Ed. 2d 344 (1985); *United States* v. *United States Gypsum Co.,* 438 U.S. 422, 98 S. Ct. 2864, 57 L. Ed. 2d 854 (1978); *Mullaney* v. *Wilbur,* 421 U.S. 684, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975).

During its instructions on intent, the trial court once instructed the jury that "every person is presumed to

*strom* claim is, however, reviewable, as it implicates a fundamental constitutional right. *State* v. *Fernandez,* 198 Conn. 1, 10, 501 A.2d 1195 (1985); *State* v. *Shine,* 193 Conn. 632, 644 n.11, 479 A.2d 218 (1984); see *State* v. *Evans,* 165 Conn. 61, 70, 327 A.2d 576 (1973).

intend the natural consequences of their act."[10] The state concedes, as it clearly must, that the instruction in question here is similar to that invalidated in *Sandstrom.* We have, however, recognized that the rule of *Sandstrom* must not be oversimplified. *State* v. *Mason,* 186 Conn. 574, 582–83, 442 A.2d 1335 (1982); *State* v. *Pina,* 186 Conn. 261, 263, 440 A.2d 967 (1982). *Sandstrom* does not invalidate, for example, the use of an "entirely permissive inference or presumption,

---

[10] "The Court: In the offenses charged there are specific intent crimes. The kidnapping is with the intent, sexual assault requires intent, robbery requires intent. One of the elements common to constitute the crimes with which the defendant has been charged is that the defendant had a wrongful intent to commit the crimes of which he has been charged. Now, the existence of that intent is a fact for you to determine and you must be satisfied that it has been proven beyond a reasonable doubt. You will hear this charge on intent several times more as it relates to the offenses involved and it is most important that you do grasp and accept it fully aware at all times that it is the State's burden to prove the existence of the intent necessary to constitute the offense in the accused mind. Now, intent is a mental process. Every person's intention may not always be known, but a person's intention may be inferred from their conduct. Every person is presumed to intend the natural consequences of their act. It is often impossible and never necessary to prove criminal intent by direct evidence. Ordinarily intent can be proved only by circumstantial evidence. What a person's purpose or intention has been is necessarily, very largely, a matter of inference. No person can be expected to come in here and testify that he looked into another person's mind and saw therein a certain purpose or intention. The only way in which a jury can determine what a person's purpose or intention was at any given moment, aside from that person's own testimony, is by determining what the circumstances were surrounding that conduct and from those infer what his purpose or intention was. To draw such an inference is not only the privilege of the jury but it is also your duty provided, of course, the inference drawn is a reasonable one. In this case, therefore, it would be part of your duty to draw all reasonable inferences from the conduct of the accused. In this case, however, the existence in the mind of the accused of the intent charged is a necessary element to constitute the crime. Because this is so it's existence must be proven beyond a reasonable doubt, as I have explained that to you. You should infer it's existence only if you are satisfied of it beyond such a doubt. If there remains such a doubt after considering all of the facts and circumstances you may find proven any reasonable explanation, any reasonable hypothesis consistent with innocence of the accused, then you can not find the intent to exist and your verdict must be not guilty."

which allows—but does not require—the trier of fact to infer the elemental fact from proof by the prosecutor of the basic one and that places no burden of any kind on the defendant." *Ulster County Court* v. *Allen,* 442 U.S. 140, 157, 99 S. Ct. 2213, 60 L. Ed. 2d 777 (1979); see *State* v. *Fernandez,* 198 Conn. 1, 20, 501 A.2d 1195 (1985); *State* v. *Arroyo,* 180 Conn. 171, 175, 429 A.2d 457 (1980). "A permissive inference suggests to the jury a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion." *Francis* v. *Franklin,* supra, 314. The mere use of the word "presume" does not render the instruction invalid. *State* v. *Arroyo,* supra. Rather, it is the "lack of qualifying instructions as to the legal effect of the presumption" that makes it possible for a reasonable jury to interpret the instruction in an unconstitutional manner. *Sandstrom* v. *Montana,* supra, 517; *State* v. *Mason,* supra, 583.

The court's instructions here describe such a permissive inference in that it allowed, but did not require, the jury to infer the mental element of intent from proof of the defendant's conduct. The jury was instructed that any inferences that it might draw must be reasonable. The language that it was its "duty" to draw inferences was merely an explanation of the earlier recognition that proof of intent is "necessarily, very largely a matter of inference." It did not transform a permissive inference into a conclusive one or shift the burden of proof to the defendant. Further, the court, in response to the defendant's exception to the initial charge, gave an additional instruction that not only emphasized the state's burden of proof on every element of the crimes, including intent, but also noted the permissive quality of any presumptions.[11]

---

[11] "The Court: Good afternoon. Three items that I am going to take up with you. One is this question of intent. The intent that is required in the mind of the actor in respect to the offenses charged is the intent that must

On many occasions this court has found no error in instructions containing language similiar to that invalidated in *Sandstrom* because the challenged instructions contained other language not present in the *Sandstrom* instructions which was sufficiently precise to rectify the improper instruction and to prevent the jury from applying the instructions in an unconstitutitional fashion. *State* v. *Asherman*, 193 Conn. 695, 734, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985); *State* v. *Vitale*, 190 Conn. 219, 221 n.1, 460 A.2d 961 (1983); *Crawford* v. *Warden*, 189 Conn. 374, 380–82, 456 A.2d 312 (1983); *State* v. *Pina*, supra, 264; *State* v. *Johnson*, 185 Conn. 163, 174, 440 A.2d 858 (1981), aff'd, 460 U.S. 73, 103 S. Ct. 969, 74 L. Ed. 2d 823 (1983); *State* v. *Stankowski*, 184 Conn. 121, 148–53, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981); *State* v. *Brokaw*, 183 Conn. 29, 34, 438 A.2d 815 (1981); *State* v. *Nemeth*, 182 Conn. 403, 411, 438 A.2d 120 (1980); *State* v. *Perez*, 181 Conn. 299, 311–16, 435 A.2d 334 (1980); *State* v. *Arroyo*, supra, 173–81.

The charge in this case, especially in light of the additional instruction, contained virtually the same permissive inference language we have held to overcome the effect of the earlier reference to a presumption of intent from conduct. See *State* v. *Mason*, supra, 584; *State* v. *Maselli*, 182 Conn. 66, 77–78, 437 A.2d 836 (1980), cert. denied, 449 U.S. 1083, 101 S. Ct. 868, 66 L. Ed. 2d 807 (1981). In deciding whether a reasonable jury could have reached an unconstitutional verdict, "we must

be proven beyond a reasonable doubt by the State. I made a statement earlier that a person is presumed to intend the natural consequences of their act. Do not equate that with the obligation in [sic] the burden of the State to prove the intent of the accused beyond a reasonable doubt. That statement refers to anybody's conduct anywhere. But you may not presume intention of the consequences of an act, but you may draw inferences from the conduct or the act of an accused to determine intention as it may have existed in the actors mind. But you may not presume the necessary intention that must be proven by evidence beyond a reasonable doubt."

look at the charge as a whole, and not sever one portion and analyze it in isolation." *State* v. *Truppi,* 182 Conn. 449, 458, 438 A.2d 712 (1980), cert. denied, 451 U.S. 941, 101 S. Ct. 2024, 68 L. Ed. 2d 329 (1981). Because the entire instruction clearly delineated the state's burden of proof on every element of the crime, including intent, the otherwise improper use of the word "presume" could not have engendered sufficient confusion to vitiate the defendant's conviction. There was, therefore, no *Sandstrom* error.

## B

The defendant also claims that the trial court erred by not instructing the jury that the crime of kidnapping could have been merely incidental to the crime of sexual assault. See *State* v. *Bell,* 188 Conn. 406, 416, 450 A.2d 356 (1982); *State* v. *Briggs,* 179 Conn. 328, 339, 426 A.2d 298 (1979), cert. denied, 447 U.S. 912, 100 S. Ct. 3000, 64 L. Ed. 2d 862 (1980); *State* v. *DeWitt,* 177 Conn. 637, 640–41, 419 A.2d 861 (1979); *State* v. *Lee,* 177 Conn. 335, 343, 417 A.2d 354 (1979). The defendant relies primarily on *State* v. *Dubina,* supra, 100, where we held that whether the detention was merely incidental to another crime was a question for the jury. He argues, therefore, that because he did request such a charge, the court's failure to give it was reversible error. We disagree.

In effect, the defendant urges us to recognize the merger doctrine,[12] that would preclude conviction for a kidnapping which was "merely incidental" to a sexual assault. We have already refused, however, to approve the doctrine. In *State* v. *Chetcuti,* 173 Conn. 165, 170, 377 A.2d 263 (1977), we noted that the legis-

---

[12] See *People* v. *Lombardi,* 20 N.Y.2d 266, 229 N.E.2d 206, 282 N.Y.S.2d 519 (1967); *People* v. *Levy,* 15 N.Y.2d 159, 204 N.E.2d 842, 256 N.Y.S.2d 793, cert. denied, 381 U.S. 938, 85 S. Ct. 1770, 14 L. Ed. 2d 701 (1965); see also annot., 43 A.L.R.3d 699 (1972); Parker, "Aspects of Merger in the Law of Kidnapping," 55 Cornell L. Rev. 527 (1970).

lature had not seen fit to merge the offense of kidnapping with other felonies, nor impose any time requirements for restraint, nor distance requirements for asportation, to the crime of kidnapping. "[W]here the elements of two or more distinct offenses are combined in the same act, prosecution for one will not bar prosecution for the other. *State* v. *Dubina,* [supra]; *State* v. *Fico,* 147 Conn. 426, 430, 162 A.2d 697 [1960]." *State* v. *Chetcuti,* supra, 169. Where the intent required to constitute kidnapping in the first degree is present, "the fact that the perpetrator's underlying motive for the detention is the consummation of [sexual assault] . . . does not preclude a conviction for kidnapping." *State* v. *Lee,* supra, 344.

Essentially, the defendant misconstrues our reference in *State* v. *Dubina* that the incidental crime issue is one for the jury. The proper inquiry is not whether the kidnapping was incidental to the sexual assault, but whether the restraint was accomplished with the requisite intent to constitute kidnapping, as well as the state of mind required for sexual assault. Whether the essential elements of kidnapping are proved beyond a reasonable doubt is a question for the jury. *State* v. *Lee,* supra, 343. The analysis, therefore, is not simply transactional. A defendant may be convicted of two crimes that derive from the same conduct "as long as the state [is] able to prove, beyond a reasonable doubt, all of the essential elements of each crime." *State* v. *Briggs,* supra.

The state was required to prove the intent to commit both kidnapping and sexual assault. In an appropriate case, if a jury were to conclude that the defendant had no intent to kidnap his victim, but only to sexually assault her, it would, in essence, be concluding that the kidnapping was merely incidental to the sexual assault. In the present case, however, the evidence clearly demonstrates that the defendant, while

displaying a knife, forcibly entered the victim's car, forced her to move over to the passenger seat and drove across a state line, where he first robbed her and then drove her to a different location where he sexually assaulted her. On these facts the jury could have reasonably concluded that the victim was abducted and that the abduction was accomplished with the requisite intent to constitute kidnapping in the first degree.

## C

The defendant also claims that he was entitled to a jury instruction that an unfavorable inference may be drawn against the state for its failure to furnish the testimony of an unknown and unnamed police officer who was in the area of the Putnam Green apartments during the evening of the sexual assault. A brief discussion of additional facts is necessary to examine this claim: The victim testified that she saw a Greenwich police cruiser when she and her assailant were parked at the apartment complex. An officer with the Greenwich police department testified that he was in the area of the apartments at 10:30 p.m. on the night of the incident. As the defendant's primary alibi witness, the owner of the Canary Bar testified that the defendant had entered the bar at approximately 10:30 that evening. To rebut the defendant's alibi, on cross-examination of the police officer, the state elicited that another officer could have been in the area of the apartments that evening. The gravamen of the defendant's claim is, therefore, that the state's failure to produce any such officer warranted the *Secondino* instruction. We disagree.

"The failure of a party to produce a witness who is within his power to produce and who would naturally have been produced by him, permits the inference that the evidence of the witness would be unfavorable to the party's cause." *Ezzo* v. *Geremiah,* 107 Conn. 670,

677, 142 A. 461 (1928). "There are two requirements for the operation of the rule: The witness must be available, and he must be a witness whom the party would naturally produce." *Secondino* v. *New Haven Gas Co.,* supra, 675. To have the jury charged on the rule, the party claiming the benefit of it must show that he is entitled to it. *State* v. *Carrione,* 188 Conn. 681, 688, 453 A.2d 1137 (1982), cert. denied, 460 U.S. 1084, 103 S. Ct. 1775, 76 L. Ed. 2d 347 (1983).

The defendant has not met his burden of demonstrating that the witness was available. In neither his argument to the trial court nor his request to charge had the defendant identified the police officer that the state would naturally have produced. The mere claim of an unidentified witness will not satisfy the defendant's burden of showing availability. *Queen* v. *Gagliola,* 162 Conn. 164, 169, 292 A.2d 890 (1972).

Additionally, the defendant has failed to satisfy the second prong of the *Secondino* analysis that the unidentified witness was a person whom the state would naturally produce. "An inference is not raised by the bare fact that a particular person is not produced as a witness, but only when it would be natural for him to be produced if the facts known by him had been favorable." *State* v. *Brown,* 169 Conn. 692, 705, 364 A.2d 186 (1975). "A witness who would naturally be produced by a party is one who is *known* to that party and who, by reason of his relationship to that party or to the issues, or both, could reasonably be expected to have peculiar or superior information material to the case which, if favorable, the party would produce." (Emphasis added.) *Secondino* v. *New Haven Gas Co.,* supra.

There has been no showing by the defendant that the missing witness was known to the state. Nor has he established that the alleged missing witness even

existed or that he had any peculiar or superior information material to the case. Accordingly, the trial court did not err by refusing to instruct the jury on the *Secondino* rule.

## V

The defendant also claims error with regard to the trial court's denial of his motion to dismiss the state's indictment. The defendant asserts two grounds for this claim: (A) that the victim's allegation was insufficient evidence to establish probable cause to arrest him for the charge of either sexual assault or kidnapping;[13] and (B) that the court lacked subject matter jurisdiction because the affidavit did not establish that a criminal offense had occured in Connecticut and also because New York had first assumed jurisdiction. The motion to dismiss was properly denied.[14]

---

[13] In our recent decision in *State* v. *Fleming*, 198 Conn. 255, 502 A.2d 886 (1986), we held that an illegal arrest does not per se invalidate an indictment based on lack of personal jurisdiction. Nevertheless, we are constrained to address the defendant's claim of lack of probable cause to arrest in this case because the arrest did lead directly to the defendant's identifications by the victim, which were admitted against the defendant in his trial. See *State* v. *Federici*, 179 Conn. 46, 425 A.2d 916 (1979).

[14] Ordinarily, a motion to dismiss the indictment must be made within ten days after the entry of a plea or "for good cause shown, at such later time as the judicial authority may fix." Practice Book § 811. The failure to abide by this requirement constitutes a waiver of defenses or objections that must be raised before trial. Practice Book § 810. In this case, the defendant entered his plea of guilty on March 16, 1982. He filed his motion to dismiss the indictment on April 16, 1982. This clearly violated the filing deadlines under the rules of practice. Although not apparent upon an examination of the trial court transcript, however, the parties have stipulated that the trial court denied the motion to dismiss on the merits on November 9, 1982. The court, therefore, implicitly recognized the good cause needed to avoid the ten day requirement of § 811. See *State* v. *Vincent*, 194 Conn. 198, 203, 479 A.2d 237 (1984). There is no claim that the court abused its discretion in finding good cause.

A motion to dismiss based on the lack of jurisdiction over the person must be distinguished from motions attacking the subject matter jurisdiction of the court, which can be raised at any stage of the proceedings, by any party or by the court sua sponte. See Practice Book §§ 810, 811.

## A

The defendant recognizes that corroboration of a victim's testimony is unnecessary to sustain a conviction for the crime of sexual assault. *State* v. *Brice,* 186 Conn. 449, 458 n.10, 442 A.2d 906 (1982); *State* v. *Dziob,* 133 Conn. 167, 169, 48 A.2d 377 (1946). Nevertheless, he asserts that the victim's initial description of him to the police was so significantly inaccurate as to require independent corroboration to establish *probable cause* to arrest.[15] "While in view of the ease of accusation and difficulty of disproof in cases of this kind, in the absence of corroboration the court should adopt a cautious approach and weigh the credibility of the complainant with care, particularily if there are improbabilities suggested by her story or there is substantial controverting evidence, it is not the law that corroboration is essential to proof of guilt." *State* v. *Zimnaruk,* 128 Conn. 124, 126, 20 A.2d 613 (1941). These concerns, however, involve the ultimate issue of the defendant's guilt beyond a reasonable doubt after a trial. In such a situation, although corroboration is not necessary for a conviction, the trier should be advised to consider carefully the quality of the complainant's testimony as well as the nature of other contradictory evidence. See *State* v. *Chuchelow,* 131 Conn. 82, 83, 37 A.2d 689 (1944).

We have not, however, extended this principle to cases challenging probable cause for the police to make an arrest based solely on the victim's complaint. The

[15] Although the facts of this case clearly show that the defendant was arrested without a warrant, the victim later prepared an affidavit to support an arrest warrant after the defendant had been arrested. The affidavit set forth the information on which the police had based their earlier arrest. The defendant's claim, therefore, refers to this affidavit, but we treat the arrest as having been made without a warrant, as actually occurred. We rely upon the affidavit, however, for the facts of which the police were aware at the time of the arrest.

level of evidence necessary to establish probable cause to arrest is substantially less than required for a conviction. *State* v. *Dennis,* 189 Conn. 429, 431–32, 456 A.2d 333 (1983). In this case the victim's description of her assailant to the arresting officer did not contain any glaring discrepancies and her identification of the defendant at the time of the arrest was unequivocal. The police officer clearly did not abuse his discretion in not obtaining additional corroborative evidence. The victim's allegations did not require corroboration in order to establish probable cause.

The defendant also claims that no probable cause was established because there was no showing of the victim's credibility. In order to establish the validity of an arrest, the victim's affidavit must establish probable cause to believe that (1) a crime has been committed, and (2) the person arrested committed that crime. See *State* v. *Heinz,* 193 Conn. 612, 617, 480 A.2d 452 (1984). " 'It is generally agreed . . . that a comparable showing [of reliability] is not needed to establish veracity when the information comes from an average citizen who is in a position to supply information by virtue of having been a crime victim . . . .' LaFave, Search and Seizure § 3.4, p. 587; see *Jaben* v. *United States,* 381 U.S. 214, 85 S. Ct. 1365, 14 L. Ed. 2d 345 (1965)." *State* v. *Daley,* 189 Conn. 717, 724, 458 A.2d 1147 (1983). We conclude that an independent showing of the victim's credibility was not required.

The defendant also claims that the facts given to the officer by the victim did not adequately establish probable cause for the kidnapping charge. It is unnecessary to consider this contention. Even if there were an inadequate basis for an arrest on the kidnapping charge, it would not have barred prosecution on that charge once the defendant was arrested for the sexual assault, probable cause for which did exist, as we have decided. See *State* v. *Heinz,* supra, 629–30.

B

The defendant also challenges the court's subject matter jurisdiction because of insufficient facts from which to conclude that criminal conduct had occurred in Connecticut and because New York had first assumed jurisdiction over the case.

The arresting officer was informed by the victim that the defendant ordered her to give him money while they were parked behind the State Line Deli in Greenwich. He was also told that the defendant forced the victim to perform fellatio on him in the parking lot of an apartment complex in that town. This information, which was later confirmed by the testimony at trial, furnished a sufficient basis for assertion of the jurisdiction of the courts of this state over the crimes involved.

The second prong of this claim presents a more novel question. As before, a few additional facts are necessary for the analysis of this claim: The state of New York initiated criminal proceedings against the defendant for the criminal actions occurring in Port Chester, New York. A grand jury in New York failed to indict the defendant, however, and the criminal charges were dismissed in March, 1982, eight months before the trial below began on November 9, 1982. The defendant claims that the dismissal entered by the New York court should preclude his criminal prosecution in this state. We disagree.

In support of his position the defendant clearly misconstrues General Statutes § 51-352c, which provides: "If any person is accused of committing any offense on the boundary or divisional line between any towns or judicial districts in the state, or so near thereto as to render it doubtful in which town or judicial district the offense was committed, the town or judicial district which *first assumes* jurisdiction by issuing process for

the arrest and prosecution of the offender . . . shall have exclusive jurisdiction to charge, present, indict, try, convict and sentence. . . ." (Emphasis added.) This statute, by its express language, does not purport to regulate the power of our state courts vis-a-vis the courts of other contiguous sovereign states. It merely establishes a basis for selecting the proper location within this state in which to present a criminal case. The statute cannot be read to apply to a criminal action that happens to straddle our state border.

Nor can the defendant rely on the principle of concurrent jurisdiction as articulated in *State* v. *Bell,* 21 Conn. Sup. 246, 250–51, 154 A.2d 142 (1959); 20 Am. Jur. 2d, Courts § 128. "There is a well-established rule that where several courts have concurrent jurisdiction of the same offense, or equal or nearly equal power and authority over a case . . . the court which first acquires jurisdiction of the prosecution generally retains it to the exclusion of others." *State* v. *Bell,* supra, 250. This rule is not applicable here because we are not presented with a situation of concurrent jurisdiction. The defendant was charged in New York, on the basis of his conduct there, with unlawful imprisonment in the first degree and robbery in the first degree. The defendant was charged in Connecticut with the crimes of sexual assault, kidnapping, and robbery predicated on his wholly separate conduct within this state. The New York courts do not have any jurisdiction over these offenses because they clearly occurred in Connecticut. See *State* v. *Volpe,* 113 Conn. 288, 294, 155 A. 223 (1931). The fact that the state of New York previously had attempted to indict the defendant is immaterial to the power of our courts to prosecute the defendant for his conduct within this state. Cf. *State* v. *Haskins,* 188 Conn. 432, 472, 450 A.2d 828 (1982); *State* v. *Moeller,* 178 Conn. 67, 420 A.2d 1153, cert. denied, 444 U.S. 950, 100 S. Ct. 423, 62 L. Ed. 2d 320

(1979). The New York grand jury that failed to indict him may well have concluded that the crimes involved had occurred in Connecticut and thus could not be prosecuted in New York.

## VI

The defendant's final claim of error is that the trial court refused to accept his pleas under the doctrine of *North Carolina* v. *Alford,* supra.[16] The record does not support his claim because it provides absolutely no indication that the defendant's guilty pleas were offered pursuant to the doctrine. Obviously recognizing that the existing record did not support his claim, the defendant filed a motion for rectification. During the hearing on this motion, trial counsel for the defendant admitted that the pleas were not offered pursuant to the *Alford* doctrine. The court found that "the record reflects there was no consideration by the court of a plea by the accused under the doctrine enunciated in *Alford* v. *North Carolina.* [sic]."

The record does indicate that the court rejected the proposed guilty pleas of the defendant because, upon inquiry by the court, he would not unequivocally admit that he had committed the underlying crimes. See Practice Book §§ 708 through 713; *State* v. *Martin,* 197 Conn. 17, 495 A.2d 1028 (1985). Acceptance of a guilty plea is within the discretion of the trial court. *State* v. *Godek,* 182 Conn. 353, 365 n.13, 438 A.2d 114, cert. denied, 450 U.S. 1031, 101 S. Ct. 1741, 68 L. Ed. 2d 226 (1981). In reviewing whether there has been an abuse of discretion, every reasonable presumption should be given

---

[16] The defendant did not raise this claim in the court below. Ordinarily, claims not raised in the trial court will not be considered by this court. *State* v. *Evans,* 165 Conn. 61, 65–66, 327 A.2d 576 (1973). Because, however, the defendant's claim essentially implicates the issue of voluntariness of the plea, it raises an issue of constitutional dimension, which we find reviewable under the "exceptional circumstances" doctrine of *State* v. *Evans,* supra.

in favor of the court's ruling. *State* v. *Brown,* 169 Conn. 692, 702, 364 A.2d 186 (1975). "Central to the [guilty] plea and the foundation for entering judgment against the defendant is the defendant's admission in open court that he committed the acts charged in the indictment." *Brady* v. *United States,* 397 U.S. 742, 748, 90 S. Ct. 1463, 25 L. Ed. 2d 747 (1970). Because the defendant did not admit his involvement in the underlying crimes, and did not inform the trial court of his claimed desire to enter the pleas under *North Carolina* v. *Alford,*[17] the trial court did not abuse its discretion by refusing to accept the defendant's pleas.

There is no error.

In this opinion the other judges concurred.

---

[17] Under *North Carolina* v. *Alford,* 400 U.S. 25, 35, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970), a criminal defendant is not required expressly to admit his guilt, but effectively to consent to being punished as if he were guilty.